ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
OATA-2023-131[1]

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>RAMÓN A. CASTILLO DEL ROSARIO<br><br>Apelante | KLAN202200734 | Apelación procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Crim. Núm.:<br>K VI2021G0018 al 20<br>KLA2021G0209 al 211<br>(Sala 1105)<br><br>Sobre:<br>Art. 93(A) 1er grado<br>Tent. Art. 93 (2c)<br>Arts. 6.05 y 6.14 (2c) L.A. |

Panel integrado por su presidente, el Juez Hernández Sánchez, la Jueza Álvarez Esnard y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 3 de diciembre de 2024.

Mediante un recurso de apelación, comparece el señor Ramón A. Castillo Del Rosario (en adelante, señor Castillo Del Rosario o parte apelante), quien solicita revisemos la *Sentencia* emitida el 26 de agosto de 2022 por el Tribunal de Primera Instancia, Sala Superior de San Juan, (en adelante, TPI).[2] Mediante el referido dictamen, el TPI condenó a la parte apelante a cumplir consecutivamente en prisión una pena de ciento treinta y nueve (139) años por el delito de Asesinato en primer (1) grado y dos (2) cargos de tentativa de asesinato, tipificados en el artículo 35 y 93, respectivamente de la Ley Núm. 146-2012, 33 LPRA secs. 5048, 5141, también conocida como Código Penal de 2012, (en adelante, Código Penal), y por los delitos de portar, transportar o usar armas de fuego sin licencia y disparar o apuntar armas de

---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución de la Jueza Grisel M. Santiago Calderón.
[2] Apéndice I del Recurso de Apelación, pág., 1.

fuego codificados en el artículo 6.05 y 6.14, respectivamente, de la Ley Núm. 168-2019, 25 LPRA secs. 466d, 466m, también conocida como la Ley de Armas (en adelante, Ley de Armas).

A continuación, destacamos que el tracto procesal del caso es sumamente extenso, por lo que trataremos de sintetizarlo.

*-I-*

El 30 de septiembre de 2021, el señor Jonathan Rodríguez Ureña, (en adelante, señor Rodríguez Ureña) se encontraba celebrando su cumpleaños en el Colmado Placita "La Parada", (en adelante el Colmado). En el lugar también se encontraban la señora Alicia Miguel Cardona, (en adelante, señora Miguel Cardona), quien fue a tomarse una cerveza y "jugar maquinita".[3] Posteriormente, a eso de las cuatro y cuarto (4:15p.m.) de la tarde, llegó la señora María Antonia Rosario Brito, (en adelante señora Rosario Brito), administradora del Colmado.[4] También, llegó cerca de la misma hora, el señor Juan Francisco Santiago Rivera (en adelante, señor Santiago Rivera). En adición, al momento de los hechos ocurridos, se encontraba la señora Elsa Molla (en adelante, señora Molla) quien estaba compartiendo con los presentes el cumpleaños del señor Rodríguez Ureña. La parte apelante también se encontraba en el Colmado en la parte de afuera, y vestía una gorra roja, una camisa color verde y un mahón largo.[5]

El señor Rodríguez Ureña le insistió a la señora Molla que se acercara a su mesa a compartir, "porque el cumpleañero soy yo".[6] Posteriormente, el señor Rodríguez Ureña le inquirió que dejara de utilizar el celular y compartiera con él, por lo que, justo en ese momento la señora Molla levanta la vista y observa que la parte apelante está entrando al Colmado de frente a ellos, y caminaba

---

[3] Transcripción Prueba Oral, Tomo I pág., 276, líneas 1-31 hasta la pág., 281, líneas 1- 28.
[4] Transcripción Prueba Oral, Tomo I, pág., 336, líneas 1.
[5] Transcripción Prueba Oral, Tomo I pág., 338, líneas 16-31 hasta la pág., 345, líneas 1-22.
[6] Transcripción Prueba Oral, Tomo II pág., 149, líneas 16-17.

directo hacia el baño.[7] Eran alrededor de las cuatro y treinta (4:30p.m.) de la tarde.

La señora Rosario Brito, se encontraba en el área de la barra, esta es en forma de "L" y queda de frente a los baños estaba interactuando con todos los presentes, no vio cuando la parte apelante entró a los baños.[8] No obstante, según el testimonio de la señora Rosario Brito, quien estaba conversando con el señor Rodríguez Ureña, sí vio a la parte apelante cuando salió del baño de caballeros, justo de frente a ella, con un arma negra en su mano y acto seguido disparó en dirección hacia el señor Rodríguez Ureña por la parte posterior de la cabeza, causándole la muerte en el acto. El señor Rodríguez Ureña cayó al piso instantáneamente. En adición, el señor Castillo Del Rosario disparó hacia el señor Santiago Rivera, quien recibió un tiro en su cabeza.

La señora Molla indicó que sintió "el fueguito" y de repente sintió otra vez el "boom". Cuando miró en dirección al baño vio a la parte apelante quien iba en dirección hacia la salida.[9] A causa de este segundo disparo, la señora Miguel Cardona quien estaba jugando "maquinita", recibió un disparo en su muñeca y cadera izquierda. En medio de la conmoción, tanto la señora Molla como la señora Rosario, se quedaron impactadas, toda vez que "la parte apelante salió del lugar como si hubiera comprado y se hubiera ido como si no pasara nada".[10] Ambas vieron a la parte apelante salir del negocio y dirigirse hacia la mano derecha en el exterior del Colmado.[11] La señora Miguel Cardona salió del Colmado y se metió al negocio del lado, de allí la sacaron y un poco más adelante, se

---

[7] Transcripción Prueba Oral, Tomo II, pág., 151, líneas 20-31.
[8] Transcripción Prueba Oral, Tomo I, pág., 347, línea 26- 27.
[9] Transcripción Prueba Oral, Tomo II. pág., 157, líneas 11-12; pág. 158, líneas 1-16.
[10] Transcripción Prueba Oral, Tomo I, pág., 354, línea 11; Transcripción Prueba Oral, Tomo II, pág.,158, líneas 14-16.
[11] Transcripción Prueba Oral, Tomo I, pág., 354, líneas 8-20; Transcripción Prueba Oral, Tomo II, pág., 354, líneas 8-14.

desplomó. La señora Molla llamó a su pareja y se fue a su casa en estado de shock.[12]

Iniciados los trámites policiales de rigor, el personal de la Policía de Puerto Rico (en adelante, Policía), se personó al lugar. También llegó personal del Instituto de Ciencias Forenses a trabajar en la escena. Se incluyó como parte de la solicitud de servicios a Centro de Rastreo, Análisis y Diseminación de Información Criminal, (en adelante, CRADIC), para la extracción de un video del edificio que quedaba justo al frente del Colmado.[13]

Posteriormente, a preguntas del agente Pedro González Reyes, la señora Rosario Brito expresó que, a la parte apelante, ella lo conocía como "el Moreno", **que no frecuentaba mucho el lugar, como una (1) o dos (2) veces al mes**. Lo describió como un hombre alto de aproximadamente seis (6) pies, con un peso de estimado de doscientas cincuenta (250) libras, tenía una camisa verde oscuro, mahón azul y gorra azul, y que, al momento de los hechos, tenía mascarilla. No obstante, añadió que con mascarilla o sin ella lo reconocería.[14] El agente González Reyes tomó la declaración brindada por la señora Rosario Brito, quien se encontraba muy nerviosa y quería irse.[15] El agente González Reyes añadió que, al regresar a la escena de los hechos, una persona se le acercó, de manera confidencial, y le dijo que la parte apelante era conocido del dueño de un negocio llamado La Juaniquita, ubicado en el Paseo de Diego.[16]

Eventualmente, el caso fue asignado al agente Jiménez Muñiz, quien entrevistó a la señora Rosario Brito el 2 de octubre de 2021 y esta le clarificó que la gorra que llevaba la parte apelante

---

[12] Transcripción Prueba Oral, Tomo II, pág., 160, líneas 24-29.
[13] Transcripción Prueba Oral, Tomo I, pág., 225, líneas 16-29; pág., 78, líneas 7-25.
[14] Transcripción Prueba Oral, Tomo II, pág., 206, líneas 21-31.
[15] *Íd.*, pág., 209, líneas 5-10; pág. 240, líneas 2-7.
[16] Transcripción Prueba Oral, Tomo II, pág., 212, línea 19.

era roja, y no azul como testificó el día del incidente.[17] En cuanto a la señora Molla, fue entrevistada por el agente Jimenez el día 3 de octubre de 2021. Esta describió a la persona que disparó como un hombre trigueño, alto de unos seis (6) pies, mayor, que lo había visto por el área y que estaba vestido con una camisa gris, gorra roja y pantalón largo.[18]

En el trámite del caso, el 1 de octubre de 2021 el Sargento Ruiz recibió una confidencia a través de llamada telefónica, de que el autor del asesinato en cuestión había estado preso hacia el año 1997 por asesinato en la calle Tapia en Barrio Obrero.[19] El Sargento Ruiz se encargó de realizar la correspondiente investigación.[20] Posteriormente, el Sargento Ruiz entregó un informe que incluía un fichaje o "mugshot" del señor Castillo Del Rosario al agente Jiménez.[21]

El 6 de octubre de 2021 en horas de la mañana, el agente Jiménez recibió una llamada confidencial en la que proveyeron una dirección, donde alegadamente se encontraba la parte apelante, siendo esta: Parcelas Hill Brothers 367-A.[22] Al recibir esta información, con la confidencia anterior que había sido provista donde se le daba un nombre y una dirección, detalló que se lo notificó al Sargento Santiago, su supervisor, para preparar un plan de acción y acudir a la dirección provista en horas de la tarde.[23] Al acudir a la dirección, se encontraron con el sujeto quien responde al nombre de Ramón A. Castillo Del Rosario.

El agente Jiménez narró que, se identificó como policía, y la parte apelante comenzó a caminar rápido, entró y se encerró en la residencia. Manifestó que, intentaron convencerlo para que saliera,

---

[17] *Íd.*, pág., 269, línea 3-10.
[18] *Íd.*, pág., 270, línea 18; pág., 271 líneas 22-31.
[19] *Íd.*, 274, líneas 12-31.
[20] *Íd.*, pág., 58, líneas 9-12.
[21] *Íd.,* pág., 61, líneas 1-18; pág., 63, líneas 1-6.
[22] *Íd.*, II, pág., 278 líneas 20-30; pág. 279, líneas 1-30.
[23] *Íd.*

pero que al no hacerlo se activó el "protocolo de personas atrincheradas".[24] Llegó la Unidad de SWAT (Special Weapons And Tactic, por sus siglas en inglés) y comenzó la comunicación a través de un megáfono para que el señor Castillo Del Rosario saliera.[25] Ante la negativa de la parte apelante, el equipo de SWAT tiró unos gases a través de una ventana y accedieron a la residencia junto con el equipo policial. Procedieron a poner bajo arresto al señor Castillo Del Rosario y lo enviaron con otros dos (2) agentes a una sala de emergencias en Río Piedras para evaluar su estado físico. El agente Jiménez añadió que se quedó en la residencia y se activó el protocolo de "K-9".[26] Surge del protocolo de "K-9", donde se examinó toda la residencia y que el can marcó en una habitación, unas gorras de lo que llaman gorras de pelotero color rojas.[27]

Ulteriormente, luego del examen médico el señor Castillo Del Rosario fue trasladado al Cuartel General, el agente Jiménez le realizó las Advertencias de Miranda.[28] La parte apelante manifestó que entendía pero que no sabía leer ni escribir, por lo que agente José Miranda Díaz, estuvo presente en calidad de testigo mientras se le realizaron las advertencias de rigor. El agente Miranda Díaz también le leyó las Advertencias de Miranda y se las explicó nuevamente para el beneficio del señor Castillo Del Rosario. A preguntas del agente Jiménez, en voz alta le inquirió ¿usted desea contestar preguntas sin la presencia de un abogado? Y él le contestó que sí.[29]

Surge de la transcripción de la prueba oral, que el señor Castillo Del Rosario dio su versión de los hechos a los agentes.

---

[24] Transcripción Prueba Oral, Tomo II, pág., 285, líneas 1-7, hasta la pág., 287, líneas 4-31.
[25] *Íd.*, pág., 287, líneas 4-15
[26] *Íd.*, pág., 287, líneas 26
[27] *Íd.*, pág., 293, línea 15, pág., 294, línea 15.
[28] *Íd.*, pág., 295, líneas 7-30.
[29] *Íd.*, pág., 299, líneas 22-24.

Declaró que, ese día estaba en el Colmado tomando cerveza, que estaba vestido con una camisa verdosa, un pantalón largo y una gorra roja, que no se acordaba del color de los tenis. **Manifestó que a él le gustaba ir mucho a ese lugar y que lo frecuenta mucho, porque es de dominicanos, hay máquinas de juego y le gustaba el ambiente**. Indicó que, había varias personas, que él fue al área del baño a orinar, y escuchó unas detonaciones, por lo que procede a salir del baño sin terminar de orinar. **Pasó caminando por encima a los dos cuerpos tirados en el piso y dobló a la derecha cuando salió del Colmado.** La parte apelante le manifestó al agente Jiménez que siguió a otros negocios que no recordaba su nombre, pero que llegó a su casa a eso de las siete (7:00p.m.) de la noche. Durante toda la entrevista, el agente Miranda Díaz estuvo presente junto al agente Jiménez. [30]

El 7 de octubre de 2021, la señora Molla y la señora Rosario Brito fueron citadas a la División de Homicidios de la Policía, para celebrar una Rueda de Confrontación y les explicaron el proceso que se llevaría a cabo.[31] Posteriormente, la señora Rosario Brito identificó a la parte apelante identificado con el número tres (3), siendo este el elegido por el señor Castillo Del Rosario. Eventualmente, la señora Molla, identificó a la parte apelante identificado con el número cuatro (4), siendo este el elegido por el señor Castillo Del Rosario.[32] Una vez celebradas las confrontaciones realizadas por las señoras Rosario Brito y la señora Molla dieron positivas, se le comunicó a la Fiscal Reyes Martínez.

Por los hechos previamente narrados y ocurridos el 30 de septiembre de 2021, el Ministerio Público presentó acusaciones contra el señor Castillo Del Rosario por violación al artículo 35 a y

---

[30] *Íd.*, pág., 300, líneas 27-31; pág. 301, líneas 1-28.
[31] *Íd.*, pág., 307, líneas 1-31.
[32] *Íd.*, pág. 318, líneas 1-30.

93 del Código Penal, *supra* y los artículos 6.01 y 6.14A Ley de Armas, *supra*. El Tribunal de Primera Instancia celebró la Vista de Lectura de Acusación el 15 de diciembre de 2021. Éste dio por leído los pliegos acusatorios e hizo alegación de no culpable. En lo pertinente al presente caso de marras, las alegaciones consignaron lo siguiente:

**K VP20212550**

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084 en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas, con la intención criminal y premeditación realizó acciones inequívocamente dirigidas a ocasionar la muerte a la Sra. Alicia Miguel Cabrera, consistente en que le disparó en el brazo, izquierdo (área de la muñeca) saliendo el proyectil por la cadera lado izquierdo y saliendo por la cadera derecha, siendo atendida en Centro Médico por el médico de turno, bajo tratamiento y siendo dada de alta, no logrando consumar la muerte pretendida por circunstancias ajenas a su voluntad.

La referida arma de fuego mortífera se describe como un arma de fuego color negra y no fue ocupada.

Hecho contrario a la ley.

**K VP20212551**

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084 en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas, con la intención criminal y premeditación realizó acciones inequívocamente dirigidas a ocasionar la muerte del Sr. Juan Francisco Santiago Rivera, consistente en que le disparó en la cabeza, siendo atendido en Centro Médico por el médico de turno, bajo tratamiento y en estado crítico, no logrando consumar [el] la muerte pretendidas por circunstancias ajenas a su voluntad.

La referida arma de fuego mortífera se describe como un arma de fuego, color negra y no fue ocupada.
Hecho contrario a la ley.

**K VP20212552**

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084

en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas y con la intención criminal disparó un arma de fuego mortífera, poniendo en riesgo la seguridad y el orden público en la dirección antes mencionada, que es un negocio o establecimiento.

La referida arma de fuego mortífera se describe como una pistola, color negra y no fue ocupada.

Hecho contrario a la ley.

### K VP20212553

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084 en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas, con la intención criminal y premeditación realizó acciones inequívocamente dirigidas a ocasionar la muerte del Sr. Jonathan Basilio Rodríguez Ureñas, consistente en que el aquí imputado utilizando un arma de fuego mortífera le realizó varios disparos, ocasionándole la muerte.

La referida arma de fuego mortífera se describe como un arma de fuego, color negra y no fue ocupada.

Hecho contrario a la ley.

### K VP20212554

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084 en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas y con la intención criminal, portaba y conducía, un arma de fuego mortífera cargada de las prohibidas por la ley de armas de Puerto Rico sin tener la licencia que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Instancia de Puerto Rico.

La referida arma de fuego mortífera se describe como un arma de fuego, color negra, no fue ocupada y fue utilizada en la comisión del delito de ASESINATO DE PRIMER GRADO, TENTATIVA DE ASESINATO, RIESGO A LA SEGURIDAD U ORDEN PÚBLICO AL DISPARAR UN ARMA DE FUEGO Y EL ART. 6.14 LEY DE ARMAS APUNTAR Y DISPARAR.

### K VP20212555

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084

en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas y con la intención criminal, apuntó y disparó con un arma de fuego mortífera cargada, color negro al Sr. Juan Francisco Santiago Rivera, de las prohibidas por la Ley de Armas de Puerto Rico sin tener la licencia que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Instancia de Puerto Rico.

Hecho contrario a la ley.

### K VP20212556

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084 en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas y con la intención criminal, apuntó y disparó con un arma de fuego mortífera cargada, color negro al Sr. Jonathan Basilio Rodríguez Ureña, de las prohibidas por la ley de armas de Puerto Rico sin tener la licencia que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Instancia de Puerto Rico.

Hecho contrario a la ley.

### K VP20212557

El referido acusado, RAMON ANTONIO CASTILLO DEL ROSARIO, allí y entonces en fecha, hora antes mencionado y en la Calle Padre Capuchino núm. 1084 en el Negocio La Placita, Río Piedras, San Juan, Puerto Rico; que forma parte de la Jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosamente, a sabiendas y con la intención criminal, apuntó y disparó con un arma de fuego mortífera cargada, color negro a la Sra. Alicia Miguel Cabrera, de las prohibidas por la ley de armas de Puerto Rico sin tener la licencia que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Instancia de Puerto Rico.

Hecho contrario a la ley.

Tras múltiples incidentes procesales que trastocaron el descubrimiento de prueba, el Juicio en su Fondo comenzó el 23 de marzo de 2022. El señor Castillo Del Rosario renunció a su derecho de Juicio por Jurado, por lo que el Juicio se celebró por Tribunal de Derecho. En la vista celebrada se procedió a marcar los documentos de la siguiente manera: Exhibit 1 por Estipulación:

Informe de patología Hoja de Identificación de cadáver, occiso Jonathan Basilio Rodríguez Ureña; Exhibit 2 por Estipulación: Una foto del occiso tamaño 8 ½ x 11 en blanco y negro.[33] En esta vista testificó el padre del señor Rodríguez Ureñas, el señor Basilio Rodríguez Henríquez, quien identificó el cadáver de su hijo.[34]

En la continuación del Juicio en su Fondo, el 10 de mayo de 2022, surge de la Minuta del Tribunal, que la parte apelante rechazó la oferta del Ministerio Público. Se desprende de la misma, que fue informado por el Tribunal y asesorado por su representación legal, que "de salir culpable en los casos, los delitos por la Ley de *Armas*, *supra*, serían consecutivos en adición a la pena agregada que aumentaría las penas".[35] En adición, se esboza: **"expresa el licenciado Vera que es correcto lo manifestado por el tribunal. El Art. 7.03 es el que establece la duplicidad de las penas, lo cual ya le explicó al acusado"**.[36] (Énfasis suplido).

Como parte de la vista celebrada, el Ministerio Público presentó durante el interrogatorio del agente Lugo Rodríguez (31843) un documento intitulado Certificación con fecha de 10 de enero de 2022 suscrito por el Agente William Lugo Rodríguez, que sin reparo de la defensa quedó marcado como Exhibit 1 Pueblo. En el contrainterrogatorio de la señora Frances Vázquez, investigadora del Negociado de Ciencias Forenses, se presentó para fines de identificación el Informe de Hallazgos de Escena del Instituto de Ciencias Forenses que consta de dieciocho (18) páginas, posteriormente marcado como Exhibit 2 Pueblo.[37] Allí, la señora Vázquez Rodríguez narró cómo se preparó el área de la escena, el equipo de trabajo que había y las funciones de cada uno.

---

[33] Minuta Juicio en su Fondo 23 de marzo de 2022.
[34] Transcripción Prueba Oral, Tomo I, pág., 60, línea 1-4.
[35] Minuta Juicio en su Fondo 10 de mayo de 2022.
[36] *Íd.*
[37] *Íd.*

Como parte de la evidencia ocupada, se desprendió lo siguiente:

> Identificación 2-A del Ministerio Publico: Sobre manila, tamaño 3 x 5 que, lee PAT-42-62-21 (1 proyectil de bala disparado.
> Identificación 2-B del Ministerio Público: Pieza: 007 E-1 (proyectil embalado).
> Identificación 2-C del Ministerio Público: Sobre manila, tamaño 3 x 5 que lee: AF-21-1368 ICF-2021-007722.
> Identificación 2-D del Ministerio Público Pieza: 008 E-1, E-2 (dos casquillos de bala). [38]

Continuado el Juicio en su fondo, el 11 de mayo de 2022 se continuó el interrogatorio a la testigo Vázquez Rodríguez, donde marcaron los Exhibit 3 al 144 por Estipulación (142 fotos a color, tamaño 8 ½ x 11 del lugar de los hechos.[39] También, se procedió a marcar como Exhibits del Ministerio Publico sin objeción de la defensa Exhibit 3 Pueblo: Documento titulado Dep[ó]sito de Evidencia control de evidencia y solicitud de análisis de laboratorio, fechado 28-abril-2022, sometido 4- oct-2021; Exhibit 4 Pueblo: Documento titulado Depósito de evidencia control de evidencia- Solicitud de análisis al laboratorio- Certificación 28-4-2022.[40] Esta narró que a base del examen realizado al señor Rodríguez Ureñas, este tenía una herida de bala en la parte posterior de la cabeza y otra en el lado izquierdo de la cabeza.[41]

Celebrada la continuación en horas de la tarde, compareció el testigo Sargento José Santiago Pérez (8-32138) y se procedió a marcar como Exhibit 5 Pueblo sin objeción de las partes: Documento titulado Consentimiento a un registro, 30-09-2021, 9:09 p.m. Extracción de evidencia digital de cámaras de seguridad (PPR-612.1). También, a solicitud del Ministerio Público se marcaron como identificación que posteriormente pasaron a ser Exhibit 6 A Pueblo: Sobre Manila, tamaño 3 x 5 que, lee: PAT-42-62-21 (1 proyectil de bala disparado); Exhibit 6-B Pueblo: Pieza

---

[38] Minuta Juicio en su Fondo 11 de mayo de 2022.
[39] *Íd.*
[40] Minuta Juicio en su Fondo 11 de mayo de 2022.
[41] Transcripción Prueba Oral, Tomo I, pág., 62, líneas 10-25.

007 E-1 (proyectil embalado); Exhibit 6-C Pueblo: Sobre Manila, tamaño 3 x 5 que lee AF-21-1368 ICF-2021-00722; Exhibit 6-D Pueblo: Pieza: 008 E-1, E-2 (dos casquillos de bala). El Ministerio Público presentó además dos (2) croquis agrandados que se añadieron al Exhibit 2 Pueblo: Exhibit 2-A Pueblo: Crosquis General vista de plano, c/ Padre Capuchino Colmado (agrandado); Exhibit 2-B Pueblo: Croquis interior Colmado Placita la Parada (agrandado).[42] El Sargento Santiago Pérez, en síntesis, explicó cómo fue el manejo para extraer las grabaciones de las cámaras del edificio que estaba frente al Colmado y que obtuvo el consentimiento del dueño del edificio, el señor Beshir Bachiri. Detalló cómo la unidad de CRADIC por conducto del agente Guerrero Santiago asistió al proceso de extracción.[43]

El 16 de mayo de 2022, en la continuación del juicio en su fondo, el Tribunal hizo constar que estuvieron reunidos en cámara. Se presentó la testigo señora Rosa Marian Castillo, patóloga forense, que posteriormente fue excusada para continuar los procedimientos en horas de la tarde. El Tribunal de Primera Instancia aceptó como exhibits del Ministerio Público: Exhibit 7 Pueblo: Informe Médico Forense PAT-4262-21, que consta de cuatro folios; Exhibit 8-A al 8-K Pueblo: Ocho (8) fotos a color de autopsia, se cualificó a la testigo Castillo como perito y se llevó a cabo el interrogatorio y contrainterrogatorio de las partes. Finalizado el día, se señaló continuación de procedimiento para el 17 de mayo de 2022.[44] En esencia, la patóloga forense concluyó que la causa de muerte fue la herida de bala en la cabeza.[45]

El 17 de mayo de 2022 el Juicio en su Fondo continuó y contó con la presencia de la testigo Frances Vázquez Rodríguez del

---

[42] Minuta Juicio en su Fondo 11 de mayo de 2022.
[43] Transcripción Prueba Oral, Tomo I, pág., 73, líneas 18-31 hasta la pág., 76, líneas 1-22.
[44] Minuta Juicio en su Fondo 16 de mayo de 2022.
[45] Transcripción Prueba Oral, Tomo I, pág., 148, líneas 24-29.

Instituto de Ciencias Forenses, donde continuó explicando sobre el proceso de la escena y su función como investigadora del Instituto de Ciencias Forenses. También, asistió el agente José Rosado, Placa # 21534 y el agente Julio E. Guerrero Santiago, Placa #28058.

Entre otros asuntos fueron marcados como prueba documental del Ministerio Publico los siguientes: Exhibit 9: Inventario de Propiedad ocupada del 1 de octubre de 2021; Exhibit 10: Inventario de Propiedad ocupada el 6 de octubre de 2021; Exhibit 11: Registro de Evidencia con número de control 2021-C-1-381; Exhibit 12: Registro de Evidencia con número de control 219.[46]

El 18 de mayo de 2022 se celebró la continuación de la vista en su fondo, donde estuvo presente el agente Julio E. Guerrero (28058), y fue cualificado como perito en cuanto a su experiencia en la división de CRADIC. Este explicó el proceso de CRADIC sobre la incautación de la evidencia digital, esbozado previamente. Detalló a su vez, que las cámaras del Colmado no funcionaban, se encontraban en mal estado y que intentó prenderlo y no funcionó.[47] Durante su testimonio, quedó marcado como exhibits del Ministerio Público la siguiente prueba: Exhibit 13-A Pueblo: Documento Titulado Solicitud de Servicio de CRADIC solicitada por el Agte. Luis Cordero; Exhibit 13-b Pueblo: Documento titulado Recibo de Evidencia Digital, Q 2021-1-162-6202; Exhibit 13-C Pueblo: Documento titulado labor Realizada el 30-09- a las 9:00p.m. Exhibit 13-D Pueblo: Documento titulado labor Realizada el 30-09-2021 a las 10:00p.m.[48] También se admitió un video DVD que lee Agte. Guerrero (28058) Q, 2021-1-162-6202 como Exhibit 145 Estipulación.

---

[46] Minuta Juicio en su Fondo 17 de mayo de 2022.
[47] *Íd.*, pág., 235, líneas 27-27.
[48] Minuta Juicio en su Fondo 18 de mayo de 2022.

Posteriormente, hubo que recalendarizar varios señalamientos por múltiples incidentes que no son pertinentes a lo que nos atañe, por lo que el 25 de mayo de 2022 se reanudó el Juicio en su fondo. El Ministerio Público continuó con el desfile de prueba y se llevó a cabo el interrogatorio, contra interrogatorio, redirecto y recontradirecto del agente Julio E. Guerrero.[49]

La continuación de los procedimientos fue reanudada el 8 de junio de 2022, donde compareció la testigo señora Miguel Cabrera quien testificó.[50] En esencia, explicó que luego de haber sufrido el impacto de la herida de bala, una amiga le envió una foto por la aplicación de mensajería "Whatsapp", donde hizo referencia al nombre de Ramón, a quien identificó posteriormente como la parte apelante.[51]

El 27 de junio de 2022, en el Juicio en su Fondo, compareció en calidad de testigo la señora María A. Rosario Brito. También se presentó la Identificación 3 Pueblo, que fue convertida al Exhibit 14 Pueblo sin objeción de la defensa.[52] La señora Rosario Brito continuó testificando el 28 de junio de 2022 y el 12 de julio de 2022, donde en esta última fecha la parte apelante realizó un ofrecimiento de prueba al Tribunal. El testimonio de la señora Rosario Brito, narró y detalló cómo ocurrieron los hechos el día 30 de septiembre de 2021, en su negocio el Colmado y sabía quién era la persona, que lo identificaría con mascarilla o sin ella, pero que desconocía su nombre, aunque le decían el "Moreno".[53] Eventualmente, explicó sobre el proceso de la rueda de confrontación, donde la señora Rosario Brito lo identificó de

---

[49] Minuta Juicio en su Fondo 25 de mayo de 2022.
[50] Minuta Juicio en su Fondo 8 de junio de 2022.
[51] Transcripción Prueba Oral, Tomo I, pág., 295, líneas 1-22; pág. 328.
[52] Minuta Juicio en su Fondo 27 de junio de 2022.
[53] Transcripción Prueba Oral, Tomo II, pág., 205, líneas 24-31 hasta la pág., 208 líneas 1-24.

manera positiva cuando compareció el 7 de octubre de 2021 a la rueda de confrontación.[54]

Adicionalmente, testificó el Sargento Arnaldo Ruiz (8-30293) y se admitió sin objeción de la parte apelante el documento titulado como Exhibit 15 Pueblo. También, se admitió como Exhibit 16 Pueblo: documento titulado Mugshot Profile de Ramón Castillo Rosario.[55] El Sargento Ruiz explicó que el 1 de octubre de 2021 recibió una confidencia a través de llamada telefónica, de que el autor del asesinato ocurrido en el Colmado había estado preso hacia el año 1997 por asesinato en la calle Tapia en Barrio Obrero.[56] El Sargento Ruiz testificó cómo se realizaba la búsqueda en los archivos del Cuartel General de la Policía de Puerto Rico.[57] Posterior a la investigación realizada, el Sargento Ruiz entregó un informe que incluía un fichaje o "mugshot" al agente Jiménez.[58]

El 14 de julio de 2022 se reanudaron los procedimientos judiciales y allí testificó el señor Juan Francisco Santiago Rivera. En resumen, el señor Santiago Rivera verbalizó que, del día de los hechos no recordaba nada. No obstante, sí testificó sobre los daños corporales permanentes sufridos como la pérdida de un ojo, daño en las cuerdas vocales entre otros. [59] Este último estuvo alrededor de dos meses (2) en el hospital Centro Médico (en adelante Centro Médico), incluyendo haber estado en coma aproximadamente por cuarenta (40) días.[60] La parte apelante durante el testimonio del señor Santiago Rivera realizó también un ofrecimiento de prueba. También testificó el señor Edward Pérez Benítez, balístico. De dicho testimonio se desprende el: documento titulado Certificado

---

[54] *Íd.*, pág. 318, líneas 1-31.
[55] Minuta Juicio en su Fondo 12 de julio de 2022.
[56] Transcripción Prueba Oral, Tomo II, pág., 274, líneas 12-31, hasta la pág., 277 líneas 1-11.
[57] *Íd.*, pág., 58, líneas 9-12.
[58] *Íd.,* pág., 61, líneas 1-18; pág., 63, líneas 1-6.
[59] Transcripción Prueba Oral, Tomo II, pág., 80, líneas 10-31 hasta la pág., 83 líneas 1-31.
[60] Transcripción Prueba Oral, Tomo II, pág., 80, líneas 10-31 hasta la pág., 83, líneas 1-31.

de Examen Sección de Armas de Fuego y Marcas de Herramienta del Instituto de Ciencias Forenses, quedando marcado como Exhibit 17 Pueblo.[61] El señor Pérez Benítez explicó todo el proceso de análisis de la evidencia relacionada al caso de autos, en este caso los proyectiles de bala, sus derivados y concluyó que correspondían a una sola arma, de calibre nueve (9) milímetros.[62]

El 18 de julio continuó la celebración del Juicio en su Fondo. Compareció la testigo señora Elsa Molla. El Ministerio Público presentó su Identificación 4: Line Up, que después fue marcada como Exhibit 18 Pueblo.[63] La señora Molla, detalló a grosso modo lo que había ocurrido el día de los hechos. También, sostuvo a preguntas del agente Jiménez en la entrevista, vio a la parte apelante entrar al negocio y dirigirse al área de los baños, vestido con una gorra roja, camisa gris y pantalón largo. Narró también que, lo vio al momento del disparo porque venía hacia ellos.[64] Eventualmente, explicó sobre el proceso de la rueda de confrontación, donde la señora Molla lo identificó de manera positiva cuando compareció el 7 de octubre de 2021 a esta.[65]

El 19 de julio de 2022, compareció a la continuidad de los procedimientos el Agente Pedro González Reyes (35052). Durante su testimonio el Ministerio Público marcó su Exhibit 19 Pueblo: Documento titulado Registro de Llamadas. El agente González Reyes explicó, que fue el agente que llegó el día de los hechos al Colmado. Que fue el encargado de tomar la declaración inicial de la señora Rosario Brito, y que posterior al proceso de la declaración regresó con la señora Rosario Brito al Colmado.[66] Expresó sobre la

---

[61] Minuta Juicio en su Fondo 14 de julio de 2022.
[62] Transcripción Prueba Oral, Tomo II, pág., 107 líneas 22-25; pág. 110, líneas 15-16; pág., 177, líneas 9-23; pág., 119, líneas 30-31 hasta la pág., 120 líneas 1-11; pág., 122, líneas 28-29.
[63] Minuta Juicio en su Fondo 18 de julio de 2022.
[64] Transcripción Prueba Oral, Tomo II, pág., 154, líneas 1-31; pág. 155, líneas 1-31.
[65] *Íd.,* pág., 162, líneas 5-8.
[66] Transcripción Prueba Oral, Tomo II, pág. 205., líneas 24-31 hasta la pág. 204, líneas 24-31; pág., 209, líneas 5-10; pág., 210, líneas 2-5

confidencia recibida al regresar al área, donde vinculaban al señor Castillo del Rosario con el dueño de un negocio ubicado en el Paseo de Diego.[67]

El 22 de julio de 2022 comparecieron ante el TPI los agentes José A. Miranda Díaz (17866), Luis Cordero Quiñonez (20336) y Wilmarie Quiñonez Benítez (37492). Surge de la Minuta del Juicio en su Fondo y de la transcripción de la prueba oral, que no hay controversia en que el señor Castillo Del Rosario no sabe leer ni escribir, pero sí sabe firmar. Por lo que no había controversia al respecto. Las partes estipularon que "el agente Miranda Díaz el día 6 de octubre de 2021 a las 5:52p.m., estuvo presente cuando el agente Javier Jiménez (27448) le leyó las advertencias de Miranda al señor Ramón del Castillo Rosario, y firmó como testigo de la lectura. A su vez, hace constar que, estuvo presente en la entrevista realizada por el Agte. Javier Jiménez; al señor acusado".[68] Continuados los procedimientos en horas de la tarde, la defensa no procedió a interrogar a la agente Wilmari Quiñonez Benítez, ni al agente Cordero Quiñonez. Además, aun cuando se hizo una estipulación; sobre las declaraciones del señor Miranda Díaz no sería utilizado.[69]

Se desprende de la Minuta del 10 de agosto de 2022, llamado la continuación al Juicio en su Fondo, compareció el agente Javier Jiménez, donde se leyó en corte abierta la estipulación sobre la presencia del agente Miranda en relación con que el señor Castillo Del Rosario no sabía leer ni escribir. El agente Jiménez testificó el día 10, 11 y 17 de agosto de 2022. En resumen, el agente declaró cómo procedió a desarrollar su estrategia de investigación, las confidencias, la prueba que había recopilado, el informe del Instituto de Ciencias Forenses entre

---

[67] *Íd.*, pág., 212, líneas 2-31 hasta la pág. 213, líneas 1-26.
[68] Minuta Juicio en su Fondo 22 de julio de 2022.
[69] *Íd.*

otros asuntos.[70] **Especificó que, ningún momento las testigos del caso tuvieron acceso a la prueba documental, ni al video antes de haberse presentado ante el Tribunal**.[71] Dicha versión, fue corroborada por ambas testigos, cuando indicaron no haber visto el video anteriormente.[72]

En cuanto al testimonio del agente Jiménez, se sometieron ante el tribunal el Exhibit 20-A al 20-D Pueblo, consistentes en cuatro (4) fotos a color tamaño 4 x 6 que muestran el lateral de la residencia con número 367-A, sin objeción de la defensa. Posteriormente, a preguntas del Ministerio Público, se presentaron y quedaron como Exhibit 21 Pueblo: una (1) foto a color tamaño 4 x 6 que muestra la parte lateral de la residencia. En adición, se marcó como Exhibit 22 Pueblo: una (1) foto a color tamaño 4 x 6 que muestra tres (3) gorras de color rojo, sin objeción de la defensa. A su vez, se marcó como Exhibit 23 Pueblo: documento titulado Advertencias Mirandas realizadas a Ramón Antonio Castillo Del Rosario. También, se marcó como Exhibit 24 Pueblo: documento titulado Hoja de Entrevista que consta de dos páginas.[73]

El Juicio en su Fondo continuó el 11 de agosto de 2022, donde compareció nuevamente el agente Jiménez. El Ministerio Público sometió como identificación y posteriormente fue marcado como Exhibit 25 Pueblo: el documento PPr-640-1 Acta sobre Rueda de Confrontación (María Rosario). Ulteriormente presentó y fue marcado como Exhibit 26 Pueblo: PPR-1640-1 Acta sobre Rueda de Confrontación (Elsa Moya). El día 16 de agosto de 2022 se dio por culminado el interrogatorio del agente Jiménez.[74]

---

[70] Transcripción Prueba Oral, Tomo II, pág., 258, líneas 1-31 hasta la pág., 401, líneas 1-24.

[71] *Íd.,* pág., 385, líneas 1-31.

[72] Transcripción Prueba Oral, Tomo I, pág., 444, líneas 14-20; Tomo II, pág., 18, líneas 24-31, pág. 189, líneas 1-12.

[73] Minuta Juicio en su Fondo 10 de agosto de 2022.

[74] Minuta Juicio en su Fondo 16 de agosto de 2022.

El 17 de agosto de 2022, luego de las partes estipular que no utilizarían más testigos, y prescindirían de otras pruebas, las partes dieron por sometido el caso. Luego del receso del período de almuerzo, el TPI escuchó los turnos de informe respectivamente y se pronunció:

> Evaluada la prueba presentada, el tribunal encuentra **CULPABLE** al acusado Ramón Antonio Castillo Del Rosario en los siguientes casos:
>
> K VI2021G0018 por el delito de Tent. Art. 93 A.C.P.
> K VI2021G0019 por el delito de Tent. Art. 93 A.C.P.
> K VI2021G0020 por el delito de Tent. Art. 93A. C.P. 1er Gdo.
> K LA2021G0209 por el delito de Art. 6.05 Ley 1680
> K LA2021G0210 por el delito de Art. 6.14-A Ley 168.
> K LA2021G0211 por el delito de Art. 6.14-A Ley 168.[75]

El 26 de agosto de 2022, luego de los trámites pertinentes sobre la información del informe pre-sentencia, la información sobre los agravantes y por qué no cualificaba para la Ley de Sentencia Suspendidas, el Tribunal condenó al señor Castillo Del Rosario.[76] El foro sentenciador dispuso las penas de la siguiente manera:

> **K VP2021G0018** por el delito de Tent. Art. 93 A.C.P.- **20 AÑOS DE CÁRCEL**
>
> **K VI2021G0019** por el delito de Tent. Art. 93 A.C.P.- **20 AÑOS DE CÁRCEL**
>
> **K VI2021G0020** por el delito de Tent. Art. 93 A.C.P. 1er Gdo.- **99 AÑOS DE CÁRCEL**
>
> ESTAS PENAS SERÁ CUMPLIDAS DE FORMA CONCURRENTES ENTRE SÍ Y CON EL DELITO DE ASESINATO EN PRIMER GRADO (KVI2021G0020), PARA UN TOTAL DE 99 AÑOS DE CÁRCEL.
>
> **K LA2021G0209** por el delito de Art. 6.05 Ley 168 **10 AÑOS** DE CÁRCEL Y SE DUPLICA LA PENA A TENOR CON EL ART. 6.01 DE LA LEY 168 PARA UN TOTAL DE **20 AÑOS DE CÁRCEL**.
>
> **K LA2021G0210** por el delito de Art. 6.14-A Ley 168- **5 AÑOS** DE CÁRCEL Y SE DUPLICA LA PENA A TENOR CON EL ART. 6.01 DE LA LEY 168 PARA UN TOTAL DE **10 AÑOS DE CÁRCEL**.

---

[75] Minuta Juicio en su Fondo 17 de agosto de 2022.
[76] Sentencia de 26 de agosto de 2024.

**K LA2021G0211** por el delito de Art. 6.14-A Ley 168 **5 AÑOS** DE CÁRCEL Y SE DUPLICA LA PENA A TENOR CON EL ART. 6.01 DE LA LEY 168 PARA UN TOTAL DE **10 AÑOS DE CÁRCEL**.

LAS PENA[S] DE LOS CASOS DE LEY DE ARMAS SERÁN CUMPLIDAS DE FORMA CONSECUTIVA ENTRE SÍ Y CON LOS OTROS DELITOS.[77]

Inconforme con tal determinación, el 11 de septiembre de 2022 el señor Castillo Del Rosario compareció ante este Tribunal de Apelaciones mediante el presente Recurso de Apelación y formuló los siguientes señalamientos de error:

Erró el Honorable Tribunal de Instancia al aplicar la duplicidad de las penas del artículo 6.01 de la misma ley cuando los pliegos acusatorios de este artículo no imputan que como resultado de la utilización de un arma alguna persona sufrió daño físico o mental

Erró el Honorable Tribunal de Instancia al encontrar al señor Castillo Del Rosario aun cuando no se demostró su culpabilidad más allá de duda razonable.

A solicitud de la parte apelante, el 14 de septiembre de 2022 presentó una *Moción en Solicitud de Transcripción de Oficio*, por estar representado por la Sociedad de Asistencia Legal, por ser indigente. Esta solicitud fue hecha al amparo de la Regla 76 (b) de nuestro Reglamento.

El 16 de septiembre de 2022, este Tribunal emitió una *Resolución* a la Coordinadora de Grabación asignada al TPI- de San Juan, a los fines de que se procediera a reproducir en discos compactos la prueba oral del juicio celebrado en el caso de epígrafe y se le ordenó a la Secretaria del Tribunal de Apelaciones a transcribir la misma. El 28 de septiembre de 2022 emitimos una *Resolución* donde dimos por cumplida la orden de la Coordinadora de Grabación, señora Monsita Denise Otero Ruiz, mediante su *Comparecencia Especial*.

Posteriormente, el 16 de septiembre de 2022 la Licenciada Lilia M. Oquendo Solis, Secretaria del Tribunal de Apelaciones,

---

[77] Minuta Juicio en su Fondo 26 de agosto de 2022.

presentó *Moción en Cumplimiento de Orden*, donde notificó que, a la fecha de la *Resolución*, la solicitud del señor Castillo del Rosario se encontraba en el turno diez (10). El 9 de noviembre de 2022 dictamos *Resolución* para que la Secretaria del Tribunal de Apelaciones, en el término de sesenta (60) días nos informara de su estatus. Ulteriormente, el 2 de febrero de 2023 la Licenciada Lilia M. Oquendo Solis, Secretaria del Tribunal de Apelaciones, presentó *Moción en Cumplimiento de Orden.* El 3 de febrero de 2023 emitimos una *Resolución* para que la Secretaria del Tribunal de Apelaciones, en el término de noventa (90) días nos informara de su estatus. El 5 de mayo de 2023 la Licenciada Lilia M. Oquendo Solis, Secretaria del Tribunal de Apelaciones, presentó *Moción en Cumplimiento de Orden,* indicando que no había sido finalizada. El 9 de mayo de 2023 emitimos una *Resolución* para que la Secretaria del Tribunal de Apelaciones, en el término de noventa (90) días nos informara de su estatus.

El 4 de agosto de 2023, la señora Mildred I. Rodríguez Rivera Sub-Secretaria del Tribunal de Apelaciones, presentó *Moción en Cumplimiento de Orden,* indicando que la transcripción aún no había sido finalizada y se encontraba en el turno número tres (3). El 14 de agosto de 2023 emitimos una *Resolución* para que la Secretaria del Tribunal de Apelaciones, en el término de noventa (90) días nos informara de su estatus. El 11 de diciembre de 2023 la Licenciada Lilia M. Oquendo Solis, Secretaria del Tribunal de Apelaciones remitió copia a este Panel de la transcripción de las vistas celebradas comprendidas en los días 23 de marzo de 2022; 10,11, 16, 17, 18 y 25 de mayo del mismo año; 8, 27 y 28 de junio de 2022. Se les concedió a las partes hasta el 16 de enero de 2024 para presentar objeciones a la transcripción y dispusimos de los términos para que presentaran sus respectivos alegatos. De igual forma, solicitamos al TPI de San Juan los Autos Originales con

fecha límite del 8 de enero de 2024 en calidad de préstamo KVI2021G0018 al 20 y KLA2021G0209 al 211, con toda la evidencia admitida en juicio.

El 22 de diciembre de 2023 el Ministerio Público presentó una *Moción Informativa sobre Transcripción y en Solicitud de Orden*, donde en esencia informó que faltaban días por transcribir, en específico los días 12, 14, 18, 19, 22 de julio de 2022; 10, 11, 16 y 17 de agosto de 2022. Por lo que, peticionó la transcripción de dichos días. Mediante *Resolución* emitida el 12 de enero de 2024, ordenamos a la Secretaria del Tribunal de Apelaciones a transcribir los días solicitados. El 28 de febrero de 2024, la Licenciada Oquendo Solís procedió a remitir la transcripción de las vistas que faltaban siendo estos los días 12,14,18,19,22 de julio de 2022; 10,11,16 y 17 de agosto de 2022. Por lo cual, mediante *Resolución* emitida el 5 de marzo de 2024, concedimos hasta el 21 de marzo de 2024 para presentar las respectivas objeciones a las transcripciones presentadas y concedimos los términos para que las partes presentaran sus respectivos alegatos.

El 19 de marzo de 2024 la parte apelante presentó una *Moción Solicitando Término Adicional*. En síntesis, sostuvo que habían solicitado la regrabación de los procedimientos, y en virtud de la magnitud de la transcripción, solicitó treinta (30) días adicionales para revisar la totalidad de la transcripción a los fines de poder estipularla o presentar objeciones. El 21 de marzo de 2024 emitimos *Resolución* concediendo el petitorio. A su vez, el 21 de marzo de 2024, el Ministerio Público sometió *Solicitud de Extensión de Término para Revisar Transcripción*. En esencia, destacó lo mismo que la parte apelante había expuesto en la moción antes relacionada. Por lo que el 1 de abril de 2024 mediante *Resolución* dictamos *Ha Lugar* la solicitud e hicimos referencia a la *Resolución* previamente emitida.

El 19 de abril de 2024, la parte apelante presentó *Moción Urgente Solicitando breve Término Adicional*. En la misma, nos informó sobre un incendio ocurrido en el TPI de San Juan, y el acceso restringido a las oficinas de la Sociedad de Asistencia Legal por el siniestro ocurrido. Solicitó una breve prórroga de cuatro (4) días para cumplir con nuestra *Orden*. Mediante *Resolución* emitida el 22 de abril de 2022 le concedimos la prórroga solicitada y se le apercibió que era final e improrrogable.

El 22 de abril de 2022 el Ministerio Público mediante *Moción Notificando Errores en Transcripción de la Prueba y Solicitud de Corrección*. El 25 de abril de 2024, mediante *Resolución* emitida, le concedimos término a la parte apelante para que se expresara. La parte apelante presentó *Moción Urgente Solicitando Paralización de Término.* Arguyó que, no había podido completar la revisión de la transcripción, por la situación del manejo del siniestro del TPI y solicitó paralización y solicitó cinco (5) días adicionales. El 26 de abril de 2024 declaramos dicha solicitud *No Ha Lugar* mediante *Resolución* emitida. Se le proveyó hasta el 15 de mayo de 2024 para presentar cualquier objeción a las transcripciones.

El 15 de mayo de 2024 el señor Castillo Del Rosario presentó *Moción en Cumplimiento de Orden y Solicitud de Corrección de transcripción.* A tenor con lo anterior, el 23 de mayo de 2024 emitimos *Resolución* a los efectos de que, se acogieron las correcciones solicitadas por ambas partes y dispusimos los términos para que cada parte presentara su alegato, incluyendo la disposición de un alegato suplementario a la parte apelante si fuera necesario.

El 20 de junio de 2024 el señor Castillo del Rosario presentó una *Moción en solicitud de páginas entregadas de forma incompleta de la transcripción de la prueba oral y de término adicional para presentar alegato.* El 25 de junio de 2024 se emitió *Resolución*

donde se trajo a la atención que ninguna de las partes notificó dicha ausencia previamente, se le ordenó a la Secretaria del Tribunal de Apelaciones a entregarlas en un término de cinco (5) días y se dispusieron los términos finales e improrrogables para presentar los respectivos alegatos.

El 28 de junio de 2024, la parte apelante presentó una *Moción informativa y en solicitud de término adicional de quince (15) días para presentar alegato*. Mediante *Resolución* emitida se le concedió la prórroga solicitada y se fijó como fecha final el 31 de julio para que la parte apelante presentara su alegato y 30 de agosto de 2024 para el Ministerio Público. El 30 de julio de 2024 la parte apelante presentó *Moción informativa <u>urgente</u> y en solicitud de remedio*, indicando que examinaron los autos originales y que faltaba prueba documental. Mediante *Resolución* emitida el 31 de julio de 2024, se declaró *Ha Lugar* la moción precitada y ordenamos al TPI a elevar a este Tribunal los CD's admitidos en evidencia durante el juicio del pleito de epígrafe. Finalmente, el 8 de agosto de 2024, ordenamos a la Secretaria del Tribunal de Apelaciones a notificar a la parte apelante que la prueba solicitada del TPI ya se encontraba disponible para su examen. De igual forma concedimos los términos finales e improrrogables para presentar los alegatos correspondientes.

Tras los trámites procesales de rigor conducentes a obtener la transcripción del juicio, la parte apelante presentó su alegato el 22 de agosto de 2024 y el 30 de septiembre de 2024 el Ministerio Público presentó el Alegato del Pueblo. Examinado el recurso en su totalidad, la transcripción de la prueba, los autos originales y con el beneficio de la comparecencia de ambas partes, resolvemos.

**-II-**

**-A-**

Es norma reiterada que los Tribunales Apelativos no debemos intervenir con la apreciación de la prueba que realizan los tribunales de instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Torres González v. Zaragoza Meléndez, supra*, pág. 846 (2023); *WMM, PFM et al. v. Colegio et al.*, 211 DPR 871,903 (2023); *Super Asphalt. v. AFI,* 206 DPR 803, 820 (2021)*; Gómez Márquez v. Periódico el Oriental Inc.,* 203 DPR 783, 784 (2020).

En ese contexto, recientemente enfatizamos que un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia." *Argüello v. Argüello,* 155 DPR 62, 79 (2001). Pero si la apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la evaluación se distancie de la realidad fáctica o esta es inherentemente imposible o increíble tenemos la responsabilidad ineludible de intervenir. **Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, no exista base suficiente que apoye su determinación**". *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 220 (2021). (Énfasis suplido).

Por otro lado, el Tribunal de Apelaciones no debe elaborar sobre la pasión, el prejuicio y la parcialidad si no puede fundamentar que esto ocurrió en el caso ante su consideración. Quien señale que el juzgador actuó mediando pasión, prejuicio o parcialidad debe sustentar sus alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión

contra el Tribunal de Primera Instancia. *Gómez Márquez v. Periódico el Oriental Inc., supra*, pág. 785.

### -B-

La presunción de inocencia es un derecho de rango constitucional en nuestro ordenamiento jurídico. Nuestra Carta Magna expresamente dispone que "[e]n todos los procesos criminales, el acusado disfrutará del derecho [...] a gozar de la presunción de inocencia". CONST. PR, Artículo II, Sec. 11 LPRA, Tomo 1. Adviértase que, "la presunción de inocencia es un derecho fundamental que le asiste a toda persona acusada de delito en nuestro ordenamiento jurídico". *Pueblo v. Colón González*, 209 DPR 967, 999 (2022); *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009).

El Tribunal Supremo de Puerto Rico ha establecido como salvaguarda de ese derecho constitucional que, para rebatir la presunción de inocencia, la prueba que presente el Ministerio Público debe ser una que satisfaga el estándar probatorio máximo en nuestro ordenamiento jurídico. Es decir, la prueba presentada por el Estado debe ser una que demuestre la comisión de los hechos imputados más allá de duda razonable. Regla 110 (f) de Evidencia de Puerto Rico, R. EVID. 110(f), 32 LPRA Ap. IV (2010); *Pueblo v. Negrón Ramírez*, 2024 TSPR 41; 213 DPR __ (2024). Esto es, "prueba suficiente para derrotar la presunción de inocencia que cobija a un acusado es aquella que permite hallar a un ciudadano culpable de la comisión de un delito al probar, más allá de duda razonable, todos los elementos del delito y la conexión del acusado con éstos". *Pueblo v. Toro Martínez*, 200 DPR 834, 855-856 (2018).

Es sabido que, el cumplimiento de este estándar no supone la necesidad u obligación de probar la comisión del delito con certeza matemática. *Íd.,* pág. 856. Lo que nuestro máximo Foro Judicial ha reiterado es que:

> **Lo que se exige, como imperativo constitucional, es "prueba satisfactoria y suficiente en derecho […] que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido"**. (Énfasis en el original). *Pueblo v. Toro Martínez, supra,* pág. 856. **Así pues, para derrotar la presunción de inocencia y probar la comisión de un delito más allá de duda razonable, no se requiere que toda duda posible tenga que ser destruida, sino que se derrote la duda razonable, la que vendría siendo aquella duda fundada en el raciocinio de todos los elementos de juicio envueltos en el caso y que no constituye una duda especulativa o imaginaria**. *Pueblo v. Negrón Ramírez, supra, Pueblo v. García Colón I,* 182 DPR 129, 175 (2011); *Pueblo v. Bigio Pastrana, supra,* págs. 760-761; *Pueblo v. Gagot Mangual,* 96 DPR 625, 627 (1968). (Énfasis nuestro).

**El cumplimiento de determinar si se satisfizo el estándar probatorio de más allá de duda razonable que impone la Regla 110 de Evidencia, *supra*, corresponde inicialmente al juzgador de hechos, quien vendrá llamado a evaluar y aquilatar la evidencia presentada ante sí para determinar cuáles hechos han quedado probados o establecidos**. *Pueblo v. Negrón Ramírez, supra; Pueblo v. Santa Vélez,* 177 DPR 61, 65-66 (2009); *Pueblo v. Negrón Ayala,* 171 DPR 406, 414 (2007). (Énfasis nuestro).

A tenor con esta garantía constitucional, nuestro sistema de derecho establece que una presunción es una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción. Regla 301 de Evidencia, R. EVID. 301, 32 LPRA Ap. IV (2010). A ese hecho o grupo de hechos previamente establecidos se le denomina "hecho básico". Al hecho deducido mediante la presunción se le nombra "hecho presumido". *Íd.* Como parte de este prisma normativo, se desprende de la Regla 303 de Evidencia, R. EVID. 303, 32 LPRA Ap. IV (2010);

> Cuando en una acción criminal la presunción perjudica a la persona acusada, tiene el efecto de permitir a la juzgadora o al juzgador inferir el hecho presumido si no se presenta evidencia alguna para refutarlo. Si de la prueba presentada surge duda razonable sobre el hecho presumido, la presunción queda derrotada. La presunción no tendrá efecto

alguno de variar el peso de la prueba sobre los elementos del delito o de refutar una defensa de la persona acusada. Reglas de Evidencia, *supra.*

Así las cosas, en la esfera penal, el efecto de una presunción "depende de si esta beneficia o perjudica al acusado. Ciertamente, una presunción que favorece al Ministerio Público y perjudica al acusado tiene que ser una presunción controvertible, permisiva y débil". *Pueblo v. Colón González, supra,* pág. 1001; *Pueblo v. Nieves Cabán,* 201 DPR 853, 873 (2019). En el ámbito criminal, el efecto de esta categoría de presunción estriba esencialmente en que no se transfiere al acusado el peso de la prueba ni la obligación de persuadir al juzgador. El Tribunal Supremo de Puerto Rico ha reiterado que "[n]o obstante, aun si este no estableciera la inexistencia de tal nexo causal, para que esta presunción satisfaga el criterio de probabilidad y, por ende, sea permisible contra un acusado, ***es esencial que la inferencia no sea la única base en la cual descansa la determinación de culpabilidad".*** *Pueblo v. Meléndez Monserrate,* 2024 TSPR 80; 213 DPR ___ (2024); (Bastardilla y subrayado en el original, énfasis nuestro).

### -C-

El artículo 92 del Código Penal, 33 LPRA Sec. 5141, define el delito de asesinato como la acción de dar muerte a un ser humano a propósito, con conocimiento o temerariamente. Por su parte, el artículo 93 (a) del Código Penal, *supra,* tipifica los grados de asesinato. Esta disposición penal legislativa establece que se constituye **el delito de asesinato en primer grado :(a) Todo asesinato perpetrado** por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, **o a propósito o con conocimiento**. 33 LPRA sec. 5142. (Énfasis suplido).

Como parte de los elementos del delito, una persona actúa a propósito con relación a un resultado cuando su objetivo consciente es la producción de dicho resultado. De igual forma,

actúa a propósito con relación a una circunstancia, cuando cree que esa circunstancia existe. Por otro lado, una persona actúa con conocimiento con relación a un resultado, cuando está consciente de que la producción de ese resultado es una consecuencia prácticamente segura de su conducta. Del mismo modo, actúa con conocimiento con relación a un elemento de circunstancia, cuando está consciente de que la existencia de esa circunstancia es prácticamente segura. Una persona actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado o la circunstancia que la ley prohíbe. 33 LPRA sec. 5035(1), (2), (3).

### -D-

La tentativa se configura cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá y sus acciones están inequívocas e inmediatamente dirigidas a la consumación de un delito. No obstante, el delito no se consuma, debido a circunstancias ajenas a su voluntad. 33 LPRA sec. 5048.

### -E-

La Ley Núm. 168-2019, *supra,* fue aprobada con el propósito principal de lograr una solución efectiva al problema del control de armas de fuego en manos de delincuentes en Puerto Rico, el cual constituye una "vertiente directa de la actividad criminal". *Exposición de Motivos* de la Ley de Armas [Parte 3] Leyes de Puerto Rico 2601. Según dispuso expresamente el legislador, "[e]stas armas son utilizadas durante la comisión de todo tipo de actos criminales, situación que hace necesario adoptar medidas legislativas cuya naturaleza sancionadora constituya un eficaz disuasivo al delincuente". *Id.,* págs. 2601–2602. *Pueblo v. Concepción Guerra,* 194 DPR 291, 310 (2015).

Por otro lado, el artículo 6.01 de la Ley de Armas, *supra,* se titula Agravamiento de las penas:

> Toda persona que resulte convicta de alguna de las disposiciones de esta Ley, y que dicha convicción esté asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de la Ley Núm. 4 de 23 de junio de 1971, según enmendada, conocida como la "Ley de Sustancias Controladas de Puerto Rico", con excepción del Artículo 404 de la misma, o de la Ley Núm. 33 de 13 de julio de 1978, según enmendada, conocida como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena provista en esta Ley. **Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en ésta o usare un arma en la comisión de cualquier delito y como resultado de tal violación, alguna persona sufriera daño físico o mental, <u>la pena establecida para el delito se duplicará.</u>** Toda violación a esta Ley en una zona escolar o universitaria conllevará el doble de la pena. [...] 25 LPRA sec. 466. (Énfasis y subrayado suplido).

El actual artículo 6.01 de la Ley de armas, mantiene una idéntica redacción a lo que era el artículo 7.03 de la Ley Núm. 404-2000, derogada.[78]  Por lo que destacamos que en contexto, posterior a la entrada en vigor de la Ley Núm. 404-2000, surgió la necesidad de reevaluar su contenido para atemperarlo a las exigencias de nuestra sociedad. *Exposición de Motivos* de la Ley Núm. 137-2004, 2004 [Parte 1] Leyes de Puerto Rico 756. Ahora

---

[78] El artículo 7.03 de la derogada Ley Núm. 404-2000, 25 LPRA sec. 460b, disponía lo siguiente: Toda persona que resulte convicta de alguna de las disposiciones de esta Ley, y que dicha convicción este asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de la Ley Núm. 4 de 23 de junio de 1971, según enmendada, conocida como la "Ley de Sustancias Controladas de Puerto Rico", con excepción del Artículo 4.04 de la misma, o de la Ley Núm. 33 de 13 de julio de 1978, según enmendada, conocida como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena dispuesta en esta Ley. Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. **Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará.** Toda violación a esta Ley en una zona escolar o universitaria según definida en el Artículo 1.02, conllevará el doble de la pena establecida. (Énfasis suplido).

bien, el artículo 7.03 de la Ley Núm. 404-2000, *supra,* sobre el agravamiento de las penas, fue enmendado por la Ley Núm. 137-2004 a los fines de añadir el siguiente párrafo:

.     .     .     .     .     .     .     .

> Todas las penas de reclusión que se impongan bajo este capítulo serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a este capítulo o por cualquiera de los delitos especificados en la sec. 456j de este título **o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará**. (Énfasis suplido).

Surge de la Exposición de Motivos de la Ley Núm. 137-2004, que la Asamblea Legislativa aprobó la misma para "fortalecer las herramientas al alcance del sistema judicial y corregir lagunas existentes para penalizar severamente al delincuente que hace mal uso de la licencia de armas y sus permisos, así como el uso de armas y municiones ilegales". Asimismo, consta del historial legislativo de la precitada Ley que el artículo 7.03, *supra,* fue enmendado para "añadir un nuevo párrafo que dispone que las penas serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, en el caso de reincidentes y **cuando existan daños a terceros por el uso ilegal del arma, la pena se duplicará**".[79] (Énfasis nuestro).

El Tribunal Supremo de Puerto Rico en el caso de *Pueblo v. Concepción Guerra, supra,* tuvo la oportunidad de dilucidar el alcance del artículo 7.03 de la Ley de Armas, *supra,* en lo que atañe a la autoridad para duplicar la pena impuesta a un acusado cuando medien agravantes y atenuantes. Asimismo, reiteró que, de conformidad con las observaciones de la Comisión de lo Jurídico

---

[79] Informe sobre el P. de la C. 4641 rendido por la Comisión de lo Jurídico de la Cámara de Representantes de 24 de mayo de 2004, 7ma Sesión Ordinaria, 14ta Asamblea Legislativa.

de la Cámara de Representantes, "**el artículo 7.03 de la Ley de Armas**, *supra*, **se enmendó a los fines de disponer que la pena se duplicará en los casos de reincidentes y <u>cuando existan daños a terceros por el uso de un arma ilegal</u>**". *Íd.*, pág. 312. (Énfasis y subrayado nuestro).

Por su parte, la Ley Núm. 168-2019 establece en el Artículo 6.05 lo siguiente:

> **Artículo 6.05. — Portación, Transportación o Uso de Armas de Fuego sin Licencia.** (25 LPRA sec. 466d)
>
> **Toda persona que porte, transporte o use cualquier arma de fuego, sin tener una licencia de armas vigente**, salvo lo dispuesto para los campos de tiro o lugares donde se practica la caza, incurrirá en delito grave y convicto que fuere, **será sancionada con pena de reclusión por un término fijo de diez (10) años**, sin derecho a sentencia suspendida, a, o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión reconocida en esta jurisdicción. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años. [...] (Énfasis suplido).

Enmarcado dentro del mencionado propósito legislativo, el artículo 6.14 de la Ley de Armas, *supra*, regula la conducta proscrita con relación a apuntar o disparar un arma. Este artículo establece que:

> **incurrirá en delito grave**, **con pena de reclusión por un término fijo de cinco (5) años,** toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:
> **(a) voluntariamente dispare cualquier arma de fuego fuera de los lugares autorizados por esta Ley, aunque no le cause daño a persona alguna; o**
> **(b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.**
> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año. [...] 25 LPRA sec. 466m. (Énfasis suplido).

### -III-

En el presente recurso, el señor Castillo Del Rosario impugna la suficiencia de la prueba y alega que, el Ministerio Público no demostró su culpabilidad más allá de duda razonable. Por otro lado, aduce que el foro de instancia incidió al duplicar la pena aun cuando los pliegos acusatorios no imputan como resultado de la utilización del arma que alguna persona sufrió daño físico o mental.

Por estar íntimamente relacionados, atenderemos los dos señalamientos de error en conjunto, los cuales versan sobre los elementos del delito y la presunción de inocencia del acusado. Examinado el expediente en su totalidad, así como la transcripción oral y el examen de la prueba documental, constatamos que la parte apelante puso en marcha la cadena de eventos que culminó con la muerte del señor Rodríguez Ureña, hirió de gravedad al señor Santiago Rivera y a la señora Miguel Cardona. *Veamos.*

Según se desprende de los testimonios de la prueba de cargo, el señor Rodríguez Ureña y la parte apelante coincidieron en el Colmado. El señor Castillo Del Rosario entró al establecimiento y se dirigió al área de los baños y cuando salió del baño de caballeros disparó a la cabeza del señor Rodríguez Ureña, causándole la muerte en el acto. Así mismo, disparó hacia el señor Santiago Rivera a quien hirió de gravedad y también hirió a la señora Miguel Cardona. Luego de esto, y según los testimonios y la prueba documental vertida, el señor Castillo Del Rosario salió caminando como si no hubiese pasado nada, y giró a la derecha una vez estuvo afuera del Colmado.

En el presente caso, los actos cometidos por el señor Castillo del Rosario configuraron el delito de Asesinato en primer grado en el artículo 93 del Código Penal, *supra,* el cual se infringe cuando una persona da muerte a otra a propósito y con conocimiento. 33

LPRA sec. 5142. Además, se configuraron los elementos del delito de tentativa, cuando disparó hacia el señor Santiago Rivera a quien hirió de gravedad y también hirió a la señora Miguel Cardona, quienes no resultaron fallecidos por circunstancias ajenas a la voluntad de la parte apelante.

A su vez, la parte apelante infringió el artículo 6.05, *supra*, el cual dispone que incurrirá en delito grave toda persona que use o transporte cualquier arma de fuego sin licencia, estableciendo un término de diez (10) años como sanción. Por otro lado, el artículo 6.14 A, *supra*, establece como delito grave con pena de reclusión de cinco (5) años el que voluntariamente dispare cualquier arma en un lugar público o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño. El Ministerio Público probó que el señor Castillo Del Rosario no contaba con licencia para la portación de armas. Indudablemente, el acto realizado por el señor Castillo Del Rosario, desembocó en la muerte del señor Rodríguez Ureña y las tentativas de asesinato contra el señor Santiago Rivera y la señora Miguel Cardona.

En lo pertinente, el referido artículo 6.01, *supra*, dispone que cuando se usare un arma de fuego en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico, la pena establecida para el delio se duplicará. En este caso, la pena del artículo 6.05 y del artículo 6.14A, *supra*. En ese sentido, este Tribunal ha interpretado en varias ocasiones, que la disposición legislativa del artículo 6.01, *supra*, es una directriz al momento de imponer la sentencia sobre la duplicidad automática, una vez haya una convicción.[80] Adviértase que, esta disposición estatutaria solo enmarca las posibilidades donde se duplicará la pena de manera específica.

---

[80] KLAN202300283, KLAN202300562, KLAN202300506.

Por lo tanto, el Ministerio Público, no tenía el deber de establecerlo en el pliego, las circunstancias que activan la duplicidad de la pena a consecuencia del artículo 6.01, *supra,* por ser una cuestión estricta de derecho. **La duplicidad de la pena es una directriz estatutaria dirigida al sentenciador al momento de imponer la sentencia.** Adviértase además que, al momento de comenzar el Juicio en su Fondo, el Tribunal orientó al señor Castillo Del Rosario las consecuencias de la duplicidad que establecía el artículo 6.01.[81] En adición, se desprende de la Minuta que "**expresa el licenciado Vera que es correcto lo manifestado por el tribunal. El Art. 7.03 es el que establece la duplicidad de las penas, lo cual ya le explicó al acusado**".[82](Énfasis suplido).

Nótese que, la duplicidad de la pena se activa con las circunstancias en las que se comete el delito tipificado en el artículo 6.05 y 6.14A, respectivamente, *supra.* En el presente caso, la parte apelante fue declarado culpable y convicto por causar la muerte a propósito del señor Rodríguez Ureña, y tentativa de asesinato del señor Santiago Rivera y la señora Miguel Cardona mediante el uso de un arma de fuego que portaba ilegalmente. En otras palabras, las circunstancias que activaron la aplicación del artículo 6.01, *supra,* en el caso de marras, fueron parte de la prueba desfilada en juicio y que motivaron la convicción del señor Castillo Del Rosario. A tenor con lo anterior, resaltamos que duplicar la pena no es un acto discrecional al momento de imponer la sentencia, por lo tanto, no era necesaria que se desprendiera del pliego.

Así las cosas, el Ministerio Público derrotó la presunción de inocencia a través de la prueba vertida, los testimonios de los testigos del Estado no fueron controvertidos por la defensa y la

---

[81] Transcripción Prueba Oral, Tomo I, pág., 8, líneas 1-26
[82] Minuta Juicio en su Fondo 10 de mayo de 2022.

imparcialidad del juzgador del TPI no fue lesionada. La ausencia de evidencia de una valoración apasionada, prejuiciada o parcializada o que el dictamen es manifiestamente erróneo, nos obliga a honrar la deferencia del foro que evaluó la prueba de primera mano. *No se cometieron los errores señalados.*

### -IV-

Por lo antes expuesto, se *confirma* la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La jueza Álvarez Esnard concurre sin voto escrito.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones